FILED

13 OCT 15 PM 1:05

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACING TECHNOLOGIES, LLC,<br><br>                          Plaintiff,<br>vs.<br>GARMIN INTERNATIONAL, INC. AND GARMIN USA, INC.,<br><br>                          Defendants. | CASE NO. 12-cv-1067-BEN (WMC)<br><br>**CLAIM CONSTRUCTION ORDER** |

In this patent infringement action, the parties sought construction of thirteen claim terms found in U.S. Patent No. 8,101,843. This matter was heard on June 27, 2013. Having considered the briefs filed by the parties and the oral argument at the hearing on the motion, the Court construes the disputed terms as follows.

## BACKGROUND

On January 24, 2012, the U.S. Patent Office approved an application for a "System and Method for Pacing Repetitive Motion Activities," and assigned U.S. Patent No. 8,101,843 (the '843 Patent). (U.S. Patent No. 8,101,843, Pl. Op. Br., Ex. A (filed Nov. 1, 2010) [hereinafter '843 Patent]). The '843 patent lists William D. Turner as the inventor, and Plaintiff Pacing Technologies, LLC ("Pacing") as the assignee. ('843 Patent, at [75], [73]).

As described in the abstract of the '843 Patent, the patent discloses "a system and method that allows users to customize audible and visible signals, such as

music or video, to maintain a pre-determined or specified pace or to achieve a new pace in repetitive motion activities such as, but not limited to, running, walking, swimming, cycling, aerobics, and the like." ('843 Patent, at [57]). Pacing has produced an iPhone application covered by the patent entitled "PaceDJ," which it describes as "designed to help runners, walkers and cyclists synchronize their pace with the tempo of songs." (Am. Compl. at ¶ 14).

Defendants Garmin International, Inc. and Garmin USA, Inc. (collectively, "Garmin") are Kansas corporations who share a Swiss parent company, Garmin Ltd. (Ans. to Am. Compl. at ¶4). Garmin International, Inc. is responsible for product design of most Garmin products, and Garmin USA, Inc. is responsible for the sale of Garmin products in the United States. (Ans. to Am. Compl. at ¶5).

Garmin sells accused products, including fitness watches. As described by Garmin, these devices do not play music or present any visible or audible beat. (Claim Const. Hr'g Tr. 20:15-16, June 27, 2013). However, some devices do allow a user to download a proposed workout from a website. (Hr'g Tr. 20:16-18). The user can enter a "cadence," such as a number of steps per minute. (Hr'g Tr. 20:18-20). The devices will then give the user an alert if the user is not operating in the desired range. (Hr'g Tr. 20:23-21:1).

Pacing filed suit against Garmin on May 1, 2012, alleging infringement of the '843 patent. (Docket No. 1). Pacing's Amended Complaint was filed on July 26, 2012. (Docket No. 21).

## DISCUSSION

### I. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). Courts determine the meaning of disputed claim terms from the perspective of a person of ordinary skill in the art at the time the patent is filed. *Chamberlain*

1  *Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008). Claim terms "are
2  generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312
3  (internal quotation marks omitted).

4  When construing claim terms, the court should first look to sources in the
5  intrinsic record. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.
6  Cir. 1996). First, "the claims themselves provide substantial guidance as to the
7  meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Second, the claims
8  "must be read in view of the specification, of which they are a part." *Id.* at 1315
9  (internal quotation marks omitted). The specification is usually "dispositive," as "it
10 is the single best guide to the meaning of a disputed term." *Id.* (internal quotation
11 marks omitted). Third, the court should consider the patent's prosecution history,
12 which is the record of proceedings before the Patent and Trademark Office ("PTO")
13 and includes the prior art cited during the patent examination. *Id.* at 1317.
14 However, "because the prosecution history represents an ongoing negotiation
15 between the PTO and the applicant, rather than the final product of that negotiation,
16 it often lacks the clarity of the specification and thus is less useful for claim
17 construction purposes." *Id.*

18 If the intrinsic evidence resolves the ambiguity in the disputed claim terms,
19 then "it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583. If
20 ambiguities in the claim terms remain, however, courts may consider extrinsic
21 evidence. *Id.* at 1584. Extrinsic evidence includes expert testimony, inventor
22 testimony, dictionaries, and scientific treatises. *Phillips*, 415 F.3d at 1317.

23 **II. The '843 Patent**
24 The '843 Patent was issued on January 24, 2012, listing Plaintiff Pacing
25 Technologies LLC as the assignee. ('843 Patent, at [73]) The patent was based on
26 U.S. Patent Application Serial No. 12/916,869. ('843 Patent, at [21]). That
27 application was a continuation of and claimed the benefit of U.S. Patent Application
28 Serial No. 11/244,241, filed on October 6, 2005, which is now U.S. Patent No.

7,825,319. ('843 Patent, at [63]) The parties initially disputed thirteen claim terms, found in Claims 22, 23, 25, 26, 27, 28, 32, and 33. The terms will be discussed in turn.

### A. "Tempo" (Claims 22, 23, 25, 27, and 32)

#### I. The Parties' Constructions

Pacing initially proposed a construction of "indication of periodicity or repetitiveness." (Pl. Op. Br., Ex. C, at 2). Garmin proposed that this Court construe the term as "continuous beat." (Def. Op. Br. at 6).

At the outset, the parties agree that "tempo" need not be limited to auditory beat. (Pl. Op. Br. at 18; Def. Op. Br. at 6). Garmin clarified that its proposed term "beat," was not necessarily musical, and could include, for example, light pulses. (Hr'g Tr. 33:7-13).

At the Claim Construction Hearing, Pacing emphasized its contention that tempo is "a rate of periodic activity or event," and not the event itself. (Hr'g Tr. 25:19-20). It characterized Garmin's construction of "continuous beat" as referring to the activity itself. (Hr'g Tr. 25:25, 26:1). At oral argument, Pacing indicated that it would be happy to accept "the rate of periodicity or repetitiveness." (Hr'g Tr. 25:22-23). However, Pacing also argued in its brief and during oral argument that tempo is an "indication of" the rate. For instance, it points out that "adagio" and "120 bpm" are "tempos," and they are visible indications of the rate at which a piece is intended to be played. (Pl. Op. Br. at 18).

Garmin characterized Pacing's construction as "a description of that beat or repetition, not the repetition itself." (Hr'g Tr. 33:16-18). Garmin argued that "tempo" referred to the "beat or pulses or something that a user can perceive that is firing at a regular interval." (Hr'g Tr. 33:14-22). Garmin stated that: "The tempo must be sensible to the user, and in our view, that means you can hear it or feel it or look at it." (Hr'g Tr. 34:2-4). Defense counsel also agreed with this Court's statement that Garmin was saying that tempo "is not an indication of rate; it is rate"

1  (Hr'g Tr. 37:7-8).

2  This Court notes that both parties repeatedly referred to "tempo" as a rate, or used "tempo" to refer to the actual rate at which a periodic activity occurred. (Hr'g Tr. 25:19-20, 26:11, 29:23-24, 36:5-8, 37:7-8).

### ii. The Claim and Specification

The word "tempo," as used in the body of the claim, is used to refer to "a rate of periodic activity."

For example, the term appears in claim 17 ("adjusting the tempo of one or more audio tracks"); claim 35 ("tempo information associated with the song files"); and claim 37 (matching "the tempo of the music" to the target tempo or target pace value). Each of these uses describes the rate of periodic activity itself.

The specification supports the Court's construction. At 3:31 and 9:8-9 of the '843 Patent, "beats per minute," a rate, is equated with the "tempo" of music. The specification also refers to meter signatures as indications of tempo in a musical piece. ('843 Patent, at col. 9:12-15). Elsewhere, the specification frequently refers to a "tempo" in a manner that is consistent with a rate of periodic activity. For instance, references are made to "the athlete's tempo is analyzed as he performs an activity," (*id.* at 1:58), "an appropriate walking tempo," (*id.* at 2:7-8), or the "tempo of the conveyer system," (*id.* at 17:16-17).

References to a "sensible tempo" in the patent demonstrate the flaws in Garmin's proposed construction of "tempo." For instance, claim 18 includes the phrase "each song file having information for producing a sensible tempo." The addition of the qualifier "sensible" in the patent where the tempo was able to be perceived by the user would be redundant if, as Garmin asserts, tempo "must be sensible to the user, and in our view, that means you can hear it or feel it or look at it." (Hr'g Tr. 34:2-4).

Pacing's efforts to limit "tempo" to an *indication* of rate are unavailing. To the extent that Pacing's proposed construction asks the Court to require "tempo" to

be a perceptible representation or expression of the rate, rather than the rate itself, the use of "sensible tempo" also weighs against a construction that is already inherently perceptible. As the specification notes, as discussed above, descriptions of the rate of periodic activity, such as "adagio" or "120 bpm" are not themselves the tempo, but are themselves descriptors of the tempo. ('843 Patent, at col. 9:12-15). This is similar to referring to "60 mph" as a speed. The label is not the speed, the rate itself is the speed. Tempo is the rate itself, rather than the description of that rate.

### iv. The Court's Construction

Tempo, as used above, refers to an inherent quality of an activity, rather than referring to a mere expression of that quality, or to the activity itself. This Court construes "tempo" as "a rate of periodic activity."

### B. "Tempo value" (Claims 25, 27, and 32)

Pacing proposed a construction of "number or other metric indicative of periodicity or repetitiveness." (Pl. Op. Br., Ex. C, at 3). Garmin submitted a construction of "number or other metric representing tempo (continuous beat)." (Def. Op. Br. at 6).

As both parties are in agreement that a "tempo value" is a "number or other metric" that represents its suggested definition of tempo, this Court will construe "tempo value" to mean "number or other metric representing tempo."

### C. "Sensible tempo" (Claim 23)/ "a tempo that is sensible to the at least one user" (Claim 22)

Related to the discussion of tempo, the parties dispute the meaning of a "sensible" tempo. Pacing asks this Court to construe the term to mean "perceptible information indicative of repetitive or periodic activity." (Pl. Op. Br., Ex. C, at 2). Garmin asserts a construction of "continuous beat able to be seen or heard that is indicative of a repetitive or periodic activity." (Def. Op. Br. at 6)

The disputed term appears in two claims. Claim 22 references a "storage

device containing the at least one data file, wherein the data file comprises information for producing a tempo that is sensible to the at least one user." Claim 23 references "a data storage and playback device for receiving the at least one data file, identifying the tempo information, and producing the sensible tempo."

As discussed above, this Court has construed "tempo" to mean a "rate of periodic activity." Ordinary construction would therefore require a "sensible tempo" to be a "sensible" rate of periodic activity.

Pacing asserts that "sensible" means perceptible, and contends that there is no reason to limit the construction to visual or auditory data. (Pl. Op. Br. at 20). Although Garmin's proposed definition mentioned "able to be seen or heard," Garmin indicated at oral argument that its claims were not limited to music, and that it can "certainly use visual information," "conceivably they might even be able to use touch," and that "we wouldn't see any way in which they could use other senses." (Hr'g Tr. 16). Furthermore, although the specifications address audio or visual files, nothing in the specification indicates that "sensible" should be limited to only two senses. There is therefore no reason for this Court to artificially narrow its construction beyond the ordinary meaning of "sensible."

This Court therefore construes a "sensible tempo" to mean a "perceptible rate of periodic activity," and "tempo that is sensible to the at least one user" as "rate of periodic activity that is perceptible to the at least one user."

**D. "Pace value" (Claims 25, 27, and 32)**

Initially, the parties submitted separate proposed constructions for "pace value." However, at oral argument on June 27, 2013, the parties reached an agreement that "pace value" shall be construed as "number representing repetitive motions performed per unit time." (Hr'g Tr. 40:9-41:18). This Court accepts and adopts this construction.

///

///

### E. "Data file" (Claims 22 and 23)

Pacing proposes that "data file" be construed as a "complete, identifiable collection of information that enables a computer to distinguish one set of information from another." (Pl. Op. Br., Ex. C, at 2). Garmin initially proposed that the term be construed as a "file containing music data." (Def. Op. Br. at 12). In Garmin's Opening Claim Construction Brief, it stated that "by this, Garmin means 'file containing data producing a continuous beat'." *Id.*

At oral argument, Garmin characterized the difference as relating to "what the data that is in the file must be about." (Hr'g Tr. 43:20-22). Garmin argued that "it must include data that is capable of producing that continuous – that repeated signal of musical beat, flash of light, word popping up," and characterized Pacing's construction as encompassing any kind of data.

Pacing stated that "our position would be, it is data that reflects the target tempo that has been entered into the website by the user." (Hr'g Tr. 44:4-6).

Inspection of the claims demonstrates that Garmin's narrower construction of "data file" is inconsistent with the use of the phrase in the claims. Claim 22 discusses "a storage device containing the at least one data file, wherein the data file comprises information for producing a tempo that is sensible to the at least one user." Claim 23 refers to "a data storage and playback device for receiving the at least one data file, identifying the tempo information, and producing the sensible tempo." Nothing in the specification suggests that "data file" has a more specialized meaning than a file that contains data. To the extent that the data file in the claim refers to data files containing a certain type, the contents appear to be described by other words in the claim.

In its Opening Brief, Garmin acknowledges that:

> To the extent that claims 22 and 23 already capture this idea in the claims themselves, Garmin does not believe that 'data file' requires further construction. But Garmin does believe that the claimed system requires transmission and storage of a specific kind of data file. . .

(Def. Op. Br. at 12).

The Court therefore adopts Pacing's proposed construction, and construes "data file" to mean a "complete, identifiable collection of information that enables a computer to distinguish one set of information from another."

### F. "Playback device" (Claims 23, 25, 28, and 33)

Pacing has proposed a construction of "arrangement of electronic components that is capable of producing output that is a visible signal, an audible signal, or a combination of a visible and an audible signal." (Pl. Op. Br., Ex. C., at 3). Pacing has also indicated to this Court that Pacing would be pleased with a definition of "a device capable of presenting stored audible or visible signals." (Hr'g Tr. 54:6-7). Garmin has proposed that the phrase be construed "device capable of playing prerecorded audio or video." (Def. Op. Br. at 13).

To "play" something, according to its ordinary meaning, usually refers to the production of sound or images. Presenting information for an instant, even generating an image that does not disappear, does not "play" that information. Something that is "played" in this sense, has multiple components, such as multiple images or multiple beats.

Pacing's proposed construction would broadly cover any device that could present stored information. For instance, this could encompass a watch that displays the time. The patent should not be stretched so far. A device that merely displayed the time, or repeated back the information entered, would not be playing the information. This court therefore determines that such a device must do more than simply present or display stored information.

Garmin contends that a "playback device" must play back prerecorded audio or visual material. Garmin points out that every reference to a "playback device" in the specification is in regard to playing prerecorded material, and each embodiment involves prerecorded audio or video files. (Def. Op. Br. at 15). It argues that the "back" in "playback" means that what is being played already exists and is pre-recorded. (Hr'g Tr. 49:2-3).

1   However, Pacing is correct in asserting that a "playback device" as used in
2   the patent is properly read to cover more than prerecorded audio or video material.
3   Claim 23 refers to a "data storage and playback device for receiving the at least one
4   data file, identifying the tempo information, and producing the sensible tempo."

5   As used in the claims and specifications, the data storage and playback device
6   generates output in response to user-provided inputs. The information is being
7   played "back" to the user in the sense that the output is based upon information that
8   was input into the system. Certainly, as Garmin points out, the specifications could
9   include the playing of prerecorded audio or video. However, there is no basis to
10  narrowly read the patent to include only devices that play pre-existing files, rather
11  than a file created from the input.

12  A playback device thus must "play" back the information entered, but this can
13  be done by playing back more than pre-recorded audio or video, and could include
14  other audio, video, or visible signal information. For instance, a system that took
15  information entered and generated a series of light pulses would be "playing" the
16  information.

17  This Court construes "playback device" to mean a "device capable of playing
18  audio, video, or a visible signal."

**G. "A repetitive motion pacing system" (Claim 22 Preamble) and "a repetitive motion pacing system for pacing a user" (Claim 25 Preamble).**

22  Claims 22 and 25 are independent claims that contain preambulatory phrases.
23  The preamble to claim 22 reads: "A repetitive motion pacing system." The
24  preamble to claim 25 reads: "A repetitive motion pacing system for pacing a user."

### I. The Preamble is a Limitation

26  As an initial matter, the parties dispute whether the preambles to claims 22
27  and 25 serve as limitations.
28  Whether a preamble serves as a limitation depends on the circumstances of

the individual patent. "In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). Preambles are also limiting when they provide an antecedent basis for limitations in the body of the claim, and are "essential to understand limitations or terms in the claim body." *Catalina Mktg.*, 289 F.3d at 808.

> However, if the body of the claim:
>
> fully and intrinsically sets forth the complete invention, including all of its limitations, and the preamble offers no distinct definition of any of the claimed invention's limitations, but rather merely states, for example, the purpose or intended use of the invention, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation.

*Pitney*, 182 F.3d 1298, 1305.

The Federal Circuit has said that no litmus test can be given with respect to when the preamble constitutes a statement of purpose for the device, or are additional structural limitations of a claim. *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). The determination of whether the preamble is a limitation is resolved upon a review of the entire patent to gain an understanding of what the inventors "actually invented and intended to encompass by the claim." *Id.*

This Court concludes that the preambles to claims 22 and 25 are limitations. A review of the patent makes it clear that "what the inventors actually invented and intended to encompass by the claim" was a device for pacing a user. *See id.*

The body of the claim, without the preamble, does not "fully and intrinsically" set forth the "complete invention, including all of its limitations." *See Pitney*, 182 F.3d at 1305. Without the preamble, it is unclear that this claim refers to a device for pacing a user, and the patent could be read to cover other devices that could meet the technical elements of the claim, but which do not and could not pace

1  a user. Reading the preambles as limitations is thus necessary to read the patent in a
2  way that covers what was actually "invented and intended." For instance, Pacing's
3  Construction Expert, Dr. Andrew Wolfe, conceded that claim 25 could be
4  interpreted to cover a user who transfers photos of runners from a device to a
5  website, but never actually uses the device to achieve a desired pace. (Wolfe Dep.,
6  Def. Op. Br., Ex. 7, at 56:13-58:12, Apr. 8, 2013). The patent is replete with
7  references to pacing a user, and an interpretation that allows devices that do not
8  pace a user to be covered by this patent cannot stand. It is therefore necessary to
9  read the preambles as limitations in order to give "life, meaning, and vitality" to the
10 claim. *See Catalina Mktg.*, 289 F.3d at 808.
11     Similarly, the Federal Circuit in *Corning Glass Works* found it appropriate to
12 read the preamble, "An optical wavelength," as a limitation where it was apparent
13 that the inventor was working on a particular problem, and not a more general
14 improvement in conventional optical fibers. 868 F.2d at 1256-57. There, the court
15 found that reading the claim to cover all kinds of optical fibers would be "divorced
16 from reality." *Id.* at 1257.
17     The situation at hand involves a system whose bare technical components
18 could be fulfilled in a manner entirely separate from what the inventor actually
19 invented and intended to encompass in the claim. It is thus necessary to read the
20 preamble as a limitation.
21                    ii. Construction of Disputed Terms
22     The parties agreed that if the preamble is a limitation, then the term should be
23 given its plain and ordinary meaning. (Pl. Op. Br., Ex. C, at 1; Def. Op. Br. at 19).
24 However, the parties dispute the plain and ordinary meaning. Pacing proposes that
25 term be construed as "a system *capable of or configured to* provide a sensible
26 output for setting a pace or rate of movement of a user when performing a repetitive
27 motion activity." (Pl. Op. Br., Ex. C, at 1) (emphasis in original). Garmin's
28 proposed construction is "a system for providing a sensible output for setting the

pace or rate of movement of a user in performing a repetitive motion activity." (Def. Op. Br. at 19).[1]

The preamble limits the invention to a "repetitive motion pacing system," or a "repetitive motion pacing system for pacing a user." With the ability to pace a user so vital to the claimed invention, this Court agrees that a the patent would only cover a system that could actually be used for pacing. Reading the preambles as limitations therefore excludes systems under either claim that could meet the bare technical components, but could not actually be used for pacing. In construing these terms, it is therefore necessary to determine when a system is created that qualifies as a "repetitive motion pacing system" or a "repetitive motion pacing system for pacing a user," within the meaning of this patent.

Pacing contends that the patent covers a situation in which someone makes or sells a system that has the recited capability, and that the system does not have to be put into use. (Pl. Op. Br. at 11) (Hr'g Tr. 59:7-13). Garmin stated that it was not contending that the system must actually be used for pacing, but that the system must be capable of being used for pacing. (Hr'g Tr. 62:5-7) Critically, Garmin alleges that this capability only arises when someone actually downloads cadence information, (Hr'g Tr. 62:7-12), and "the only time this system is being created is when the user actually goes and hooks these things together in a way that you have this set of components," (Hr'g Tr. 62:20-25).

System claims do not require the performance of any method steps. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010). To infringe a claim that recites capability and not actual operation, an accused device "need only be capable of operating" in the described mode. *Id.* (citing *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir.1991)). Where non-method

---

[1] Garmin's opening brief asserts that the parties agree to the definition it offers. (Def. Op. Br. at 19). However, as Pacing offered a different construction in its Opening Brief, (Pl. Op. Br., Ex. C, at 1), and the parties vigorous disputed the scope of the terms in brief and at oral argument, the Court treats the "plain and ordinary meaning" of this term as disputed.

claims described capabilities without requiring that any components be "active" or "enabled," it was not necessary to show that users activated the functions programmed. *Id.* However, the Federal Circuit overturned a jury verdict of inducement in *ACCO Brands* where the patentee failed to point to specific instances of direct infringement or show that the accused device necessarily infringed the patent. 501 F.3d 1307, 1313 (Fed. Cir. 2007). The Federal Circuit later distinguished *ACCO Brands* by pointing out that *Finjan*'s claims did not require the software to be configured in a particular way, only that it be programmed for performing certain steps. 626 F.3d at 1204. However, in *ACCO Brands*, the claim language required the locking device's pin to actually extend through a slot in a specific configuration. *Id.*

### a. "Repetitive motion pacing system" (Claim 22)

Claim 22 describes a "repetitive motion pacing system." It has four requirements. The first is a "server for receiving a plurality of user-provided parameters and transmitting at least one data file." As it is a server "for" doing this, it appears that the server need only have the capability. *See Finjan*, 626 F.3d at 1204-05 (interpreting items described as "for" performing a function as describing capabilities and not requiring that components be active or enabled). The claim also requires a "user profile database for storing the plurality of user-provided parameters," and "a communications network for transmitting the at least one data file to the at least one user." These elements largely appear to require the capability of doing something when something else occurs, but clearly envisions that it has occurred.

Most clearly, the third element of claim 22 is a "storage device containing the at least one data file, wherein the data file comprises information for producing a tempo that is sensible to the at least one user." In order for a "storage device" to qualify under this claim, it must therefore actually contain "the" data file transmitted by the server, and the data file must contain information for producing a sensible

tempo for "the" user. This element is therefore satisfied only when a data file and user exist.

Read in its entirety, the "repetitive motion pacing system" described in the body of claim 22 is only created when a relevant data file has been created and exists on the storage device.

The Court therefore construes "repetitive motion pacing system" within the meaning of claim 22 to mean "a system for providing a sensible output for setting the pace or rate of movement of a user in performing a repetitive motion activity," and determines that such a system arises when a relevant data file has been created and exists on the storage device.

b. "Repetitive motion pacing system for pacing a user" (Claim 25)

Claim 25 is a "repetitive motion pacing system for pacing a user." This preamble requires that the system be "for" pacing a user, connoting a capability. It requires a "web site adapted to allowing the user" to engage in a number of activities. This element is clearly satisfied by the mere existence of a website "adapted to" allowing those activities, and does not require that they were actually used. The second element, "a data storage and playback device" also appears to require only the existence of a device with this capability.

The final element of Claim 25, however, is "a communications device adapted to transferring data related to the pre-selected activity or the target tempo or the target pace values between the web site and the data storage and playback device." This need only be "adapted to" performing this function, but its capability is defined in relation to "the pre-selected activity or the target tempo or the target pace values." The claim term thus presupposes the existence of one of these categories of information.

The Court therefore construes "repetitive motion pacing system for pacing a user" within the meaning of claim 25 to mean "a system for providing a sensible output for setting the pace or rate of movement of a user in performing a repetitive

motion activity" and determines that such a system arises when relevant data "related to the pre-selected activity or the target tempo or the target pace values" comes into existence.

### H. "Server" (Claim 22)

Claim 22 refers to a "repetitive motion pacing system" which comprises, *inter alia*, "at least one server for receiving a plurality of user-provided parameters and transmitting at least one data file."

Pacing proposes that "server" be construed as a "combination of hardware, software, and stored data that is accessed over a network, such as the Internet, and is used to provide a service to a client computer." Garmin proposed that the term be construed as a "computer dedicated to run one or more services."

Critical to the parties' differences is the inclusion of a "network" and "client computer" in the construction offered by Pacing. (Hr'g Tr. 68). Pacing contends that "the concept of network is fundamental to server." (Hr'g Tr. 68:15) and points out that in all instances in the patent, the server is connected by a network. (Hr'g Tr. 69:5-6). However, Garmin points out that the network is separately labeled and defined in the patent. (Def. Op. Br. at 20).

This Court agrees that the patent presents no compelling reason to narrow the definition of "server" to require the inclusion of a network. Where the patent envisioned a network, it included and separately labeled a network, rather than using "server" to imply a network. There is therefore no need to infer a network from "server."

Additionally, narrowing the definition to require a "network" as Pacing understands it may be contradicted by the specification. Although no specific definition was offered, Pacing stated that its understanding of "network" as used in the patent would not include a watch connected to a computer by a USB port. (Hr'g Tr. 73-75). This conflicts with the discussion of Figure 1 in the specification. Figure 1 describes a preferred embodiment, which includes both a server and a

network. ('843 Patent, col. 6:37-47, fig. 1). In discussing Figure 1, the specification states that it is "also contemplated" that server 120 could be a computer in a peer-to-peer network. ('843 Patent, at col. 8:22-29). This discussion of a proposed alternative demonstrates that a "network," as Pacing seeks to define it, is not essential to the construction of "server."

The Court construes the term "server" to mean a "computer dedicated to run one or more services."

### I. "Visible Signal" and "Audible Signal" (Claim 27)

Pacing asks this Court to construe a "visible signal" as "data that is visually perceptible," and "audible signal" as "data that is audibly perceptible." (Pl. Op. Br., Ex. C, at 3-4). Garmin asks that this Court instead construe visible signal to mean "data indicative of target tempo or target pace values that is able to be seen," and "audible signal" to mean "data indicative of target tempo or target pace values that is able to be heard."

Claim terms "are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (internal quotation marks omitted). In this instance, the ordinary meaning of the terms is clear. Garmin has sought to narrow the terms to include only data that is "indicative of target tempo or target values." Examination of the patent indicates that such a narrowing would be inconsistent with the way the terms are used in claims. To the extent that the signals at issue contain a certain kind of data, the claims specify that detail. For example, claim 27 specifies that the "the signal is related to the pre-selected activity or the target tempo or the target pace values." ('843 Patent, at col. 19:41-45). A narrower construction in this instance would generate redundancy.

The Court hereby construes "visible signal" to mean "data that is visually perceptible," and "audible signal" to mean "data that is audibly perceptible."

### J. "Web Form" (Claim 32)

Parties agree that the term should be given its plain and ordinary meaning.

(Hr'g Tr. 83-84). Pacing suggested that the ordinary meaning of "web form" is "web page that accepts user entered data." (Pl. Op. Br., Ex. C, at 4). Garmin did not offer a definition. As there is no dispute that the plain and ordinary meaning controls, and there is no dispute asserted as to the plain and ordinary meaning in this case, this Court determines that the term does not require construction.

### K. "Output Device" (Claim 26)

The parties agree that the ordinary meaning of the term controls. (Hr'g Tr. 83-84). Pacing offered a definition of the term as "electronic component that provides for output of data perceptible to a user using one of their senses." (Pl. Op. Br., Ex. C, at 3). Garmin did not propose a construction. (Hr'g Tr. 84:1-2). As no dispute has been asserted as to the ordinary meaning of this term, this Court determines that the term does not require construction.

### CONCLUSION

For the reasons stated above, the Court construes the disputed terms as follows:

| Term | Court's Construction |
|---|---|
| Tempo | Rate of periodic activity |
| Tempo value | Number or other metric representing tempo |
| Sensible tempo/tempo that is sensible to the at least one user | Perceptible rate of periodic activity/rate of periodic activity that is sensible to the at least one user |
| Pace value | Number representing repetitive motions performed per unit time |
| Data file | Complete, identifiable collection of information that enables a computer to distinguish one set of information from another |
| Playback device | A device capable of playing audio, video, or a visible signal |
| Repetitive motion pacing system | A system for providing a sensible output for setting the pace or rate of movement of a user in performing a repetitive motion activity |
| Repetitive motion pacing system for pacing a user | A system for providing a sensible output for setting the pace or rate of movement of a user in performing a repetitive motion activity |

| Server | Computer dedicated to run one or more services |
| --- | --- |
| Visible signal | Data that is visually perceptible |
| Audible signal | Data that is audibly perceptible |
| Web form | Does not require construction |
| Output device | Does not require construction |

**IT IS SO ORDERED.**

Dated: 10/15/2013

By: _____
HON. ROGER T. BENITEZ
United States District Judge